FOURTH DIVISION
FILED:  JUNE 29, 2006

1-04-1740, 1-04-2591 (Consolidated)

| | | |
|---|---|---|
| OMAYDA RUIZ, Individually and as Independent Administrator of the Estate of HAROLD SEPULVEDA, Deceased | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 00 L 9461 |
| THE CITY OF CHICAGO, a Municipal Corporation, | ) ) | Honorable Mary A. Mulhern, |
| Defendant-Appellee | ) ) | Judge Presiding. |
| (IGNACIO FORNARIS, Individually and as Agent, Servant and/or Employee of NORWEGIAN AMERICAN HOSPITAL d/b/a PRO-HEALTH MEDICAL CENTER, INC. | ) ) ) ) ) | |
| Defendant). | ) | |

JUSTICE MURPHY delivered the opinion of the court:

On August 21, 1999, Harold Sepulveda died as the result of a severe asthma attack.  As administrator of the estate of Harold Sepulveda, plaintiff filed suit against the City of Chicago (the City) alleging that paramedics took an unreasonable amount of time to arrive at the scene and failed to properly treat Harold.  Plaintiff also alleged that Dr. Ignacio Fornaris failed to properly treat Sepulveda from the age of four until his death.  Finally, plaintiff advanced a product liability claim against Schering-Plough Health Care Products, Inc. (Schering-Plough), alleging the inhaler it manufactured was ineffective.

Plaintiff voluntarily dismissed Schering-Plough after the company demonstrated

its inhaler was not defective.  Also prior to trial, Fornaris filed a contribution claim against plaintiff alleging that she was negligent in caring for Sepulveda.  The City filed a motion in limine to bar plaintiff's two expert witnesses that were to opine that the paramedics did not comply with the standard of care for the situation.  The trial court granted the City's motion and subsequently granted its motion for a directed verdict because plaintiff no longer had an expert to establish the standard of care, the threshold element of a medical malpractice claim.

The jury returned a verdict against Dr. Fornaris and awarded plaintiff $4 million for the wrongful death count and the estate $4.25 million on the survival count. However, the jury found plaintiff 35% at fault; thus, her damages were reduced to $2.6 million.  Plaintiff then settled with Fornaris for the $1 million limit on his insurance policy. Counsel for plaintiff was awarded costs and attorney fees of $262,500 pursuant to section 2-1114 of the Code of Civil Procedure (735 ILCS 5/2-1114 (West 2004)) and costs of $29,374.32 for a total of $291,874.32.  In addition, $10,000 was to remain in the client trust account for purposes of plaintiff's appeal.  With plaintiff's approval, counsel petitioned the trial court for an enhancement of fees to 33 1/3% or $333,333. Therefore, $70,833.33 was also set aside and placed in an interest-bearing escrow account pending this appeal.

Plaintiff now appeals the trial court's granting of the City's motions.  Plaintiff's counsel appeals the denial of his petition for an enhanced fee.  This court consolidated these two claims and for the following reasons, affirms the trial court.

## I.  BACKGROUND

According to records from the City of Chicago Office of Emergency Communications (OEC), on August 21, 1999, at 1:18:59 a.m., a call was received for assistance with a child having an asthma attack at 1438 North Artesian Avenue. Plaintiff made this 911 call to request help for her 10-year-old son Harold Sepulveda, who was having a severe asthma attack.  Plaintiff stated that it was the worst attack Sepulveda had ever had.  Plaintiff tapped on the side of his chest, administered a nebulizer and made him walk around to exercise his lungs.  Plaintiff then went to the outside door of their apartment building to wait for the paramedics.

Paramedics Johnny Musa and Kerry Pakucko, along with student trainee Ken Cardenas, responded to the call from the fire station located at West Potomac Avenue and North Western Avenue.  According to the OEC records, the paramedics were aboard ambulance A44 en route to plaintiff's apartment at 1:21:08 a.m. and arrived at 1438 North Artesian Avenue at 1:26:23 a.m.  The OEC records also indicate that two additional 911 calls were made from plaintiff's apartment at 1:22:43 a.m. and 1:24:53 a.m.  These two calls were made by plaintiff's sister, who remained in the apartment with Sepulveda.

Musa was a regular driver on ambulance runs in other areas of the city and had been assigned to this fire station as a one-day substitute for another paramedic.  The paramedics were informed that they were responding to a call about an asthmatic child located in the second-floor apartment at 1438 North Artesian Avenue.  Although the fire

station was approximately three blocks from plaintiff's apartment, the paramedics took over five minutes to arrive because Musa first missed North Artesian Avenue. After missing this turn, Musa was unable to turn north for two streets as they were one-way streets in the wrong direction. Musa stated that ambulance drivers are to avoid speeding and driving the wrong way down a one-way street. Eventually, worried about the delay, Musa made the turn north on North Rockwell Avenue, then turned and traveled the wrong way on a one-way street to again go the wrong way on North Artesian Avenue and reach plaintiff's apartment.

Upon arrival, the paramedics came upon plaintiff, who was standing in the street. Plaintiff told the paramedics that Sepulveda was very sick and had been having an asthma attack for two days. The paramedics grabbed oxygen, a jump bag and a monitor, and ascended the stairs to plaintiff's apartment. Musa testified that plaintiff's apartment was poorly lit and that they found Sepulveda in the living room, slumped over a sofa. They placed him on the sofa and determined that he was not breathing and did not exhibit a pulse.

Musa picked Sepulveda up and carried him downstairs to the rig while he performed cardiopulmonary resuscitation (CPR) and Pakucko performed ventilations on Sepulveda with the ventilator bag. Musa admitted they could have intubated Sepulveda in the apartment; however, as the apartment was dark, the rig was a better place to work and this also eliminated the risk of the tube becoming dislodged when carrying him down to the ambulance. In the rig, Pakucko intubated Sepulveda and Musa started an

intravenous line, connected the monitor and EKG machine, and administered epinephrine and atropine.

At 1:37:38 a.m., Musa drove the ambulance from 1438 North Artesian Avenue to St. Elizabeth Hospital while Pakucko continued to administer CPR. They arrived at the emergency room at St. Elizabeth Hospital approximately two minutes later. However, the emergency room doctors were unable to resuscitate Sepulveda and he was pronounced dead at 2:28 a.m.

On August 18, 2000, plaintiff filed a complaint against the City, Schering-Plough, and Dr. Fornaris. Plaintiff's amended complaint dropped Schering-Plough and retained the City and Dr. Fornaris as defendants. Plaintiff brought wrongful death and survival claims against the City alleging that prior to, and during, the course of treatment of Sepulveda, the paramedics willfully and wantonly violated "Paramedic Standing Orders," depriving him of necessary care, causing unnecessary pain and suffering and, ultimately, his death. In her disclosures pursuant to Supreme Court Rule 213 (177 Ill. 2d R. 213), plaintiff identified Joseph Ligouri, a paramedic, and Dr. Jesse Hall as her expert witnesses.

Ligouri's deposition was taken on July 11, 2003, by the City. Ligouri testified that he was a volunteer paramedic in Long Island, New York, from 1977 to 1982, when he moved to Broward County, Florida. Ligouri stated that he has been a paramedic for the Delray Beach Fire Department in Florida since 1984 and was currently certified in Florida as a paramedic. Ligouri testified that Delray Beach Fire Department serves

6

62,000 residents and has six ambulances and three advance life support engines on duty.

Ligouri testified to several calls that he had been on that involved asthma attacks and that he had seen minors die from these attacks. Ligouri further testified that he had intubated three pediatric patients as a paramedic. Ligouri was qualified as an American Heart Association pediatric advanced life support provider. In addition, he stated that he was familiar with the American Heart Association's advanced cardiac life support training. However, this is not a certification program or a national standard. Ligouri further testified that there is no national certification for paramedics and that each state is different.

Specifically, Ligouri was unable to testify about certification processes in Illinois or Chicago. Ligouri had reviewed the Chicago Fire Department standing medical orders, the Chicago Fire Department policies and procedures, the Chicago Police Department investigation report of this incident, the event logs for August 21, 1999, and the depositions of Pakucko, Cardenas, and Musa. Based on review of these documents and his experience as a paramedic, Ligouri opined that he was qualified to testify as to the standard of care in Cook County, Illinois.

With respect to the response time of the paramedics, and Musa's missing North Artesian Avenue, causing a delay in their arrival, Ligouri testified that there was no national standard of care with respect to familiarization of streets. Ligouri was not familiar with a standard of care in Cook County on this issue either, but opined that,

based on his years of service, the paramedics should have had a better familiarization with the streets in the area. Further, Ligouri opined that Pakucko should have informed Musa he was going the wrong way when he passed North Artesian Avenue.

Ligouri admitted that the paramedics initially evaluated the situation correctly, namely, that Sepulveda was not breathing and had no pulse and that CPR and oxygen were required. Ligouri opined that the paramedics' decision to remove Sepulveda to the rig, rather than intubate him and administer CPR in the apartment, violated the standard of care outlined in the standing medical orders. Ligouri also admitted that he was not familiar with the equipment utilized by paramedics in Cook County, but based his opinions on equipment he used in Delray Beach, Florida.

Ligouri stated that the darkness in the room would not make intubating the child any more difficult, though administering fluids via an intravenous drip might have been more difficult. In addition, Ligouri did admit there would have been a risk of the tube falling out when the patient was carried down the stairs. Essentially, Ligouri argued that immediacy in administering oxygen and CPR was required as every second dramatically increases the chances of a successful resuscitation. Ligouri did not know when Sepulveda's heart had stopped or when he had stopped breathing.

Prior to trial, the City filed its motion *in limine* to bar the testimony of Ligouri. The City argued that the standard of care for the issues at trial was local and not national. Accordingly, Ligouri's admission that there was no national standard of care and his lack of familiarity with local practice required the trial court to bar his testimony as an

expert. The trial court found that, though he was a licensed paramedic, it was clear from Ligouri's testimony that he was unfamiliar with the local standard of care in Cook County or the City of Chicago, or a similar community, and thus, he did not meet the standard of competency to testify to the standard of care applicable to the paramedics in this case.

The trial court then granted the City's motion for directed verdict because plaintiff had no expert to testify to the local standard of care to support her claim against the City. Following the trial, the trial court also denied plaintiff counsel's petition for enhancement of fees and his motion to reconsider the denial of his petition. These appeals followed and were consolidated by this court.

## II. ANALYSIS

### A. The City's Motion *in Limine* and Motion for Directed Verdict

In an action for medical malpractice, the plaintiff first bears the burden of proving the proper standard of care against which the defendant's conduct is measured. Purtill v. Hess, 111 Ill. 2d 229, 241-42 (1986). In this case, plaintiff alleged that the paramedics for the City violated the standard of care by not giving oxygen and CPR immediately to Sepulveda. Plaintiff argues that the testimony of her expert Ligouri was sufficient to support his certification as an expert, and ultimately, this threshold issue of the standard of care. The City counters that the trial court's decision to exclude the testimony of Ligouri was within its discretion and proper. Further, the City argues, the trial court properly granted its motion for a directed verdict, because without the

8

testimony of Ligouri, plaintiff could not establish the first element for medical malpractice, the standard of care.

To qualify as an expert in the medical field, the witness must be a licensed member of the school of medicine about which he intends to testify and he must be familiar with the methods, procedures, and treatments ordinarily observed in the defendant's community or similar community. Sullivan v. Edward Hospital, 209 Ill. 2d 100, 112-13 (2004). Finally, the trial court has discretion to determine if these foundational matters are met such that the expert is competent to testify to the issues at hand. Gill v. Foster, 157 Ill. 2d 304, 317 (1993). The City argues not only are Gill and Sullivan clear on the discretion vested in the trial court at this stage, but that all decisions regarding the admission of evidence, including expert testimony, are discretionary. Swick v. Liautaud, 169 Ill. 2d 504, 521 (1996).

Plaintiff contends that the expert qualification protocol represents application of the law when determined without an evidentiary hearing, thus implicating the de novo standard of review. TCA International, Inc. v. B & B Custom Auto, Inc., 299 Ill. App. 3d 522 (1998). Plaintiff argues that the trial court based its decision to exclude Ligouri on an erroneous conclusion of law, namely, that his foundational testimony was improperly elicited by leading questions, and thus review must be de novo. Beehn v. Eppard, 321 Ill. App. 3d 677, 680-81 (2001). However, as discussed below, we do not find this to be the case and review the trial court's decision to exclude Ligouri under an abuse of discretion standard as clearly outlined in Gill and Sullivan.

First, there is no argument that Ligouri met the first prong of the foundational requirement for expert witnesses, that he is a licensed paramedic. Therefore, review centers on whether Ligouri was sufficiently familiar with the methods, procedures, and treatments ordinarily observed in the defendant's community or similar community to establish his competency as an expert. Plaintiff argues that an entity's own rules of conduct would be the highest, most objective source for a standard of care and that, coupled with his vast experience as a paramedic, Ligouri's review of the Chicago Fire Department standing orders and policies and procedures was sufficient to certify him as an expert. Plaintiff argues that Wojcik v. City of Chicago, 299 Ill. App. 3d 964 (1998), stands for this proposition.

In Wojcik, the plaintiff brought a medical malpractice action against the City of Chicago and paramedics for failure to properly treat her hypoglycemia. Wojcik, 299 Ill. App. 3d at 967. In the issue of note, she argued that the trial court abused its discretion in allowing defendant City of Chicago to introduce testimony that the standing medical orders established the standard of care. Wojcik, 299 Ill. App. 3d at 977. The City presented the testimony of a nurse manager for the emergency room at Ravenswood Hospital who trained paramedics. This witness testified that the standing medical orders establish the standard of care for treating patients in the City of Chicago. Wojcik, 299 Ill. App. 3d at 978.

This court found that the trial court did not abuse its discretion in allowing the standing medical orders into evidence. Wojcik, 299 Ill. App. 3d at 977. In doing so, the

10

court noted that evidence of compliance with standing orders and local rules is not conclusive of the standard of care, but *may be admissible* as evidence to aid the trier of fact in determining the standard of care. Wojcik, 299 Ill. App. 3d at 978. Because the nurse was qualified to testify and her testimony was consistent with the minimum national standards proffered by the plaintiff's witnesses, the trial court did not abuse its discretion in allowing admission of this evidence. Wojcik, 299 Ill. App. 3d at 978.

We first disagree that the trial court based its decision on the leading questions of Ligouri. Rather, the trial court found that the only times Ligouri noted the local standard of care were in leading questions from plaintiff's counsel. The trial court specifically noted that Ligouri testified several times that he did not know the standard of care in Cook County or the City of Chicago. Further, Ligouri specifically noted that there was no national standard of care on these key issues. The trial court cited to Sullivan and the requirement that an expert must be familiar with local methods, procedures and treatments before finding that "[t]hat is absolutely absent in this case." The trial court did not say that leading questions were improper but utilized this testimony, along with Ligouri's admissions that he did not know the standard of care, to determine it was "perfectly clear to [it]" that Ligouri was not competent as an expert.

We also reject plaintiff's assertion that Wojcik stands for the proposition that the standing orders may be utilized to establish the standard of care. Wojcik plainly states that standing orders and the like are not conclusive evidence of a standard of care. Rather, Wojcik grants discretion to the trial court as to the admissibility of standing

11

orders only when they may assist the trier of fact in determining the proper standard of care. In that case, the witness testifying to the orders was a nurse; however, she was a nurse *practicing in Chicago who trained City of Chicago paramedics.* Furthermore, the witness and standing orders were consistent with the testimony of the plaintiff's experts.

In this case, Ligouri is a paramedic licensed in Delray Beach, Florida, a community wholly lacking any similarity to the City of Chicago. Ligouri repeatedly admitted that he did not know the local standard of care for Cook County or the City of Chicago. Any testimony remotely close to this was as a response to leading questions and based solely on his reading of the standards of care. The trial court properly found the City's standing medical orders were not conclusive evidence of the standard of care and that Ligouri lacked sufficient familiarity with the City's practices and standard to establish his competency as an expert. It follows that, since plaintiff could not establish the standard of care, her medical malpractice claim against the City failed.

B. Petition for Enhancement of Fees

As noted above, plaintiff was successful at trial in her claims against Dr. Fornaris; however, she settled with Fornaris for his insurance policy limit of $1 million and postjudgment interest of $38,959.64. Pursuant to section 2-1114 (735 ILCS 5/2-1114 (West 2004)), counsel was awarded $262,500 in fees plus $29,374.32 in costs for a total of $291,874.32. Further, an additional $10,226.90 from the settlement proceeds was placed in a trust account for purposes of the appeal of plaintiff's issue. Counsel now appeals the trial court's denial of his petition for enhanced fees and his motion to

reconsider. A denial of a petition for enhanced fees is reviewed under an abuse of discretion standard. Clay v. County of Cook, 325 Ill. App. 3d 893, 899 (2001).

Counsel agrees that section 2-1114(a) limits attorney fees in medical malpractice actions to 33 1/3% of the first $150,000 recovered, 25% of the next $850,000 recovered, and 20% of any amount recovered over $1 million. 735 ILCS 5/2-1114(a) (West 2004). In fact, counsel's contract with plaintiff specifies this exact contingency fee scale as the terms of his employment. However, counsel argues (as he included in his contract) that section 2-1114(c) allows for an enhancement of fees upon petition to the court where the attorney "performs extraordinary services involving more than usual participation in time and effort." 735 ILCS 5/2-1114(c) (West 2004).

Counsel cites the holding in Clay to support his claim. In Clay, plaintiff's attorney, Mark G. Slutsky, appealed an enhancement of $138,000 as it was less than he had requested. Clay, 325 Ill. App. 3d at 895-96. Slutsky argued that he had to spend an inordinate amount of time, allegedly over 2,000 hours, and money, $114,000 total on trial preparation, to achieve a favorable outcome. Clay, 325 Ill. App. 3d at 895. Slutsky noted that he was the third attorney who had worked the case and that he was severely limited by decisions of prior attorneys and spoliation of evidence. Clay, 325 Ill. App. 3d at 896. In support, Slutsky submitted affidavits of prior counsel, opposing counsel and former jurists who all opined that the case at hand was extraordinary, novel and difficult making an enhanced fee reasonable. Clay, 325 Ill. App. 3d at 903.

The trial court did not grant Slutsky's request for a full 33 1/3% fee, but did grant

13

additional fees.  This court found that the trial court did not abuse its discretion in awarding the lesser amount.  Clay, 325 Ill. App. 3d at 904.  In the decision, it was noted that Slutsky provided no details as to how he compiled 2,000 hours and that, aside from prior counsel's affidavit detailing expert contacts, only provided affidavits with conclusory statements that the case was novel and an enhanced fee was reasonable.  Clay, 325 Ill. App. 3d at 903.  Further, this court noted that Slutsky's fee in the vicinity of $800,000 was substantial and for which substantial time and skill should be expected.  Clay, 325 Ill. App. 3d at 903.

Counsel in this case argues that he is entitled to an enhancement of fees.  He notes that Clay upheld an award of a $400 hourly rate and that, for an attorney of his skill, reputation in the community as an experienced litigator in medical malpractice matters and the extraordinary effort and result, an hourly rate of $250 to $300 would be reasonable.  Counsel cites to plaintiff's original claims that the paramedics did not arrive for over a half an hour and that Sepulveda's inhaler was defective, which eventually proved false.  Counsel also details plaintiff's contributory negligence that he had to overcome to achieve a positive verdict.  Finally, counsel repeatedly argues that defendants never offered a settlement in this case, even during jury deliberations.  Accordingly, counsel asserts that he put forth extraordinary effort and the trial court abused its discretion in denying his petition.

A review of the record does not identify such risks or excessive effort such that an enhancement of counsel's fee is proper.  Even if we accepted counsel's "time

14

sheets" as accurate, we cannot find that the case or hours were so extraordinary that an enhanced fee is proper. We note that this court was presented with the question of whether the trial court abused its discretion in not granting Slutsky additional funds, not whether a $400 hourly fee was reasonable or whether this fee might be an acceptable baseline. Further, like in <u>Clay</u>, the affidavits provided by counsel in this case are merely conclusory statements that the case at hand was difficult and, at best, attempt to establish that the requested fee enhancement would be fair.

Medical malpractice cases are inherently difficult and risky. This is something an accomplished attorney certainly understands. An accomplished and experienced attorney certainly is also aware of insurance policy limits and the risk of being unable to attain compensation beyond those limits. These are all risks an attorney takes in advancing such a case on a contingency basis. The rewards may also be immense. While it may have become almost customary for parties to offer settlement, a plaintiff is not entitled to a settlement offer, especially in a case such as this, where even plaintiff's counsel argues on appeal that the facts were close. Taking the case to trial does not make counsel's effort extraordinary.

The court in <u>Clay</u> noted that $800,000 was a substantial award and the trial court's denial of a further enhancement was not an abuse of discretion. Likewise, though not as substantial, an award of $262,500 plus costs of $29,374.32 remains a substantial amount of money for an estimated 1,537.6 hours of work. Counsel claims his requested enhancement is fair and reasonable; he does not provide any evidence

15

that his work was extraordinary for this field.

In sum, we do not find the trial court abused its discretion. In fact, we adopt the trial court's concluding paragraph from its order denying counsel's petition as a clear summation of this issue: "Whether the enhanced fee is fair and reasonable or whether a settlement offer is made is not dispositive of whether petitioner expended extraordinary services and more than the usual participation in time and effort in this case. Regardless of the reason, the legislature has decided that an attorney's fees in medical malpractice cases is limited; if this court were to adopt petitioner's assertion that since the enhanced fee sought is fair and reasonable and he had to try this case to verdict, he is entitled to the relief sought, Section 5/2-1114 is eviscerated."

## III. CONCLUSION

Accordingly, for the aforementioned reasons, the decision of the trial court is affirmed.

Affirmed.

CAMPBELL, J. and GREIMAN, J., concur.