SIXTH DIVISION
December 15, 2006

No. 1-04-3350

| | | |
|---|---|---|
| MICHAEL MADALINSKI, Individually and as Special | ) | Appeal from the |
| Administrator of the Estate of Carol Madalinski, Deceased, | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 01 L 13513 |
| | ) | |
| ST. ALEXIUS MEDICAL CENTER, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| (Monico, Pavich and Spevack, | ) | The Honorable |
| | ) | Carol Pearce McCarthy, |
| Petitioner-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiff-appellant Michael Madalinski was represented by petitioner-appellant law firm

of Monico, Pavich & Spevack (Monico or firm) in a medical malpractice action he filed

individually and as special administrator of the estate of his deceased wife, Carol Madalinski,

against defendant St. Alexius Medical Center.  Before a verdict was rendered, the suit settled for

$5,750,000.  Thereafter, Monico petitioned the trial court for "extraordinary fees" in the amount

of one-third of the gross settlement pursuant to section 2-1114(c) of the Illinois Code of Civil

Procedure (Code) (735 ILCS 5/2-1114 (West 2002)).  The court denied this request.  The firm

now appeals, contending that the trial court misinterpreted section 2-1114.  Monico asks that we

find that the court wholly failed to use its discretion, reverse its ruling and enter an order

approving the petition for a one-third fee or, alternatively, that the court abused its discretion and

No. 1-04-3350

reverse and remand the matter for further proceedings on the petition. For the following reasons, we reverse and remand.

BACKGROUND

A stipulation was entered into and included in the record on appeal between Madalinski, by and through Monico, and St. Alexius agreeing that St. Alexius would not file a brief and would otherwise have no part in this appeal. Thus, we consider the instant appeal on Madalinski and Monico's brief only, pursuant to First Capitol Mortgage Corp. v. Talandis Construction Corp., 63 Ill. 2d 128, 133 (1976).

Monico presented the following evidence at the hearing on its petition for fees. In October 2001, approximately one month prior to the expiration of the statute of limitations, Madalinski retained Monico to determine if he had a viable claim against St. Alexius for the death of his wife. Two other law firms had previously rejected Madalinski's case. Monico conducted an expedited review and, after consulting with experts, determined that the case had merit but that it would be vigorously defended. Monico explained this to Madalinski, along with the fact that existing commitments would require an extraordinary effort on the firm's part in taking his case. For example, Robert Pavich, who would be the primary attorney on Madalinski's case, had been assigned by the United Nations War Crimes Tribunal for the Former Yugoslavia as consulting and lead counsel in several matters, requiring a three- to six-year commitment in Europe. Thus, Monico was in the process of opening an international office there and staffing it with some of its paralegals, resulting in a reduced number of cases the firm could accept in the United States.

2

After quickly gathering evidence to support Madalinski's claims, Monico timely filed a lawsuit on his behalf, as well as on behalf of his and decedent's minor children, containing counts pursuant to the Wrongful Death Act (740 ILCS 180/1 *et seq*. (West 2002)), the Survival Act (755 ILCS 5/27-6 (West 2002)), and the Rights of Married Persons Act (Family Expense Act) (750 ILCS 65/0.01 *et seq.* (West 2002)).

During discovery on the case, Pavich was often required to leave his post in Europe to return and participate in the litigation. Some 45 discovery depositions were taken by both parties, mainly of medical personnel. Pavich returned to take or defend depositions of the treating physicians, as well as eight liability expert depositions. In addition, St. Alexius produced lengthy manuals and protocols outlining its procedures and policies, which attorneys at Monico spent weeks reviewing. The firm filed a motion to compel an incident report and peer review findings, which required briefings, hearings and several depositions. In preparing Madalinski's side of the case, Monico retained four liability experts and one damages expert. Two of these experts resided out of state. The firm consulted at length with all these experts to form opinions on the case. Monico prepared the experts for trial, discussed with them their thoughts on St. Alexius' position, and reviewed with them medical literature relied upon by both parties' experts during depositions. Prior to trial, Monico initiated mediation between the parties; two all-day mediations were conducted for which the firm prepared extensive submissions. Neither mediation, however, resulted in an offer by St. Alexius.

The cause proceeded to a jury trial, which lasted from June 21, 2004, to July 8, 2004. Monico defended against at least 27 motions *in limine* filed by St. Alexius, while also filing

several such motions on behalf of Madalinski. The firm called 20 witnesses to testify, including 6 medical witnesses via evidence deposition, one of which had required the parties to travel out of state. Meanwhile, Monico participated in settlement negotiations with St. Alexius throughout the trial, culminating in a high-low agreement after the case was submitted to the jury of $2 million to $5,750,000. The jury returned a verdict in favor of Madalinski and against St. Alexius for $12,407,572. According to the high-low agreement, Madalinski accepted a settlement of $5,750,000 for him and his minor children.

Monico filed a petition with the trial court to approve the settlement and for attorney fees in the amount of one-third of the gross settlement, or $1,916,666.67, pursuant to section 2-1114(c) of the Code. The court approved the settlement but denied the firm's claim for fees, finding that it was entitled to only $1,212,500, pursuant to section 2-1114(a) of the Code. Monico filed a motion to reconsider. It attached two affidavits to this motion: one from Geoffrey Gifford, a former president of the Illinois Trial Lawyers Association who had been a plaintiffs' attorney specializing in medical malpractice cases for 27 years, and one from Brian Fetzer, a fellow of the American College of Trial Lawyers and defense attorney specializing in medical malpractice cases for 29 years. Gifford and Fetzer had conducted the all-day mediations in Madalinski's case. Both Gifford and Fetzer averred that due to their medical malpractice experience, they were familiar with the time and labor required by Monico in this case, as well as the difficulty and novelty of the issues involved. They also stated that as mediators here, upon reviewing the evidence and the "comprehensive submissions" prepared by the firm during this litigation, "it became obvious that [Monico] had invested an extraordinary amount of time and

effort during the discovery and pretrial stages of the case." Gifford and Fetzer further averred that "this was a difficult case with a significant risk of a defense verdict" and that the issues had been "vigorously contested." Their affidavits concluded by stating that the firm "demonstrated an exceptional degree of skill, tenacity and perseverance throughout the pretrial, mediation and trial phases," and that a one-third fee amount was customary and reasonable in such cases. In addition, Monico attached a study to its motion to reconsider prepared by the American Bar Association (ABA) detailing a decline in the number of civil jury trials and verdicts, which it attributed to the complexity and length of these cases. Monico also presented a copy of the attorney-client contract Madalinski had signed at the time he retained the firm detailing his agreement to pay "a sum equal to <u>one-third</u> of the gross sum recovered" (emphasis in original), as well as orders entered in two other medical malpractice cases Monico worked on awarding the firm one-third fee amounts.

At the hearing on Monico's motion to reconsider, the court admitted that subsection (c) of section 2-1114 of the Code does allow for "extraordinary fees." However, the court stated that it had "looked at everything" the firm had presented and concluded that extraordinary fees were not warranted here. The court "took into consideration" "all of the factors" espoused in <u>Clay v. County of Cook</u>, 325 Ill. App. 3d 893 (2001), which, as cited by Monico in its petition, is the preeminent case on this issue. It acknowledged that Monico had taken Madalinski's case on the last day of the statute of limitations and that its attorneys worked on it while working full-time outside the country, got the case to trial in just two years, won it, and did "a nice job." The court also acknowledged that Madalinski had signed the one-third fee contract with the firm, and it

considered the ABA article and affidavits attached to the firm's motion. Yet, upon reviewing all this, the court found Madalinski's case was in "the bell curve for every medical malpractice case" that had come before it, "neither at one extreme nor the other" in the context of difficulty. After repeatedly stating that it "looked at everything" Monico had submitted, the court declared that its fee petition was "wanting in relation to the requirements [the court] has to take into consideration" in awarding extraordinary fees and that it "f[e]ll far short" of them. It noted that there were "no huge amounts" of motions filed, no interlocutory appeals and no mistrials that had to be retried. The court characterized the attached affidavits as "conclusory in nature" and found the ABA study irrelevant. It further concluded that Monico had already received over $1.2 million in fees, and that Madalinski was now required to support his two minor children by himself with the settlement. Based on this, the trial court denied the firm's motion to reconsider.

ANALYSIS

Section 2-1114 of the Code governs attorney fees in medical malpractice actions. See 735 ILCS 5/2-1114 (West 2002). It states, in relevant part:

> "(a) In all medical malpractice actions the total contingent fee for plaintiff's attorney or attorneys shall not exceed the following amounts:
>
> 33 1/3% of the first $150,000 of the sum recovered;
>
> 25% of the next $850,000 of the sum recovered; and
>
> 20% of any amount recovered over $1,000,000 of the sum recovered.
>
> ***
>
> (c) The court may review contingent fee agreements for fairness. In

special circumstances, where an attorney performs extraordinary services involving more than usual participation in time and effort the attorney may apply to the court for approval of additional compensation." 735 ILCS 5/2-1114 (West 2002).

As Monico and the trial court in the instant case both acknowledged, Clay is the preeminent case regarding section 2-1114 and additional compensation in medical malpractice actions. See Clay, 325 Ill. App. 3d 893; see also Ruiz v. City of Chicago, 366 Ill. App. 3d 947, 955-57 (2006) (reviewing Clay and reaffirming its principles). In Clay, a man was stabbed and, during his treatment at the county hospital, he was rendered a quadriparetic. He retained attorneys to represent him in a medical malpractice action against the county, but these attorneys voluntarily dismissed the suit when they could not find an expert to testify that the county deviated from the standard of care. The man then retained attorney Mark Slutsky, who was able to find such and expert and settle the case for $3 million. Slutsky later filed a petition for attorney fees reflecting "extraordinary services" pursuant to section 2-1114(c), beyond the statutory maximum allowed under section 2-1114(a). Slutsky contended that the case had been complex and difficult, that he spent an inordinate amount of time developing theories and locating experts, and spent over 2,000 hours and $114,000 on the case. He told the court he was faced with problems due to decisions by the client's former attorneys, had trouble finding the doctors involved, and that key evidence (X-ray films) was lost, making his representation even more difficult. He attached several affidavits to his petition for fees--from the client, opposing counsel, an attorney who had voluntarily dismissed the case and three former judges--describing

the difficulty of the case, the complexity of the issues and the time required, and all concluding that Slutsky performed extraordinary services and deserved a one-third fee. The trial court found that Slutsky had performed extraordinary services pursuant to section 2-1114(c) and awarded him $138,000, more than the normal fee under section 2-1114(a) but less than one-third. Slutsky appealed.

The reviewing court held that the trial court had not abused its discretion in its holding and, thus, it would not award Slutsky a one-third fee. See Clay, 325 Ill. App. 3d at 901. Beginning with an analysis of section 2-1114(c), the Clay court noted that the statute makes clear with its permissive but not obligatory language that, even if a court finds the attorney performed extraordinarily, it is not required to award him one-third; rather, it may conclude he is entitled to one-third, more than one-third or less than one-third as compensation. See Clay, 325 Ill. App. 3d at 901 (the "statute permits a range of awards for attorneys who perform extraordinary services and not every award of additional fees will" be the same, as there is no specific entitlement or limit). As a guideline, the Clay court determined that the criteria our state supreme court enumerated in Illinois Supreme Court Rule 1.5 (134 Ill. 2d R. 1.5) to consider the reasonableness of attorney fees in general would provide a proper review for additional compensation requests under section 2-1114(c) as well. See Clay, 325 Ill. App. 3d at 902 (factors listed in Rule 1.5 which assist in determining the reasonableness of a general fee "may be utilized in evaluating fee awards under the provisions of section 2-1114"). These evaluating criteria include:

> "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent." 134 Ill. 2d R. 1.5.

See also Clay, 325 Ill. App. 3d at 902, quoting Chicago Title & Trust Co. v. Chicago Title & Trust Co., 248 Ill. App. 3d 1065, 1072 (1993) (" '[i]n assessing the reasonableness of fees, the trial court should consider a variety of factors, including the skill and standing of the attorneys employed, the nature of the case, the novelty and difficulty of the issues involved, the degree of responsibility required, the usual and customary charge for the same or similar services in the community, and whether there is a reasonable connection between the fees charged and the litigation' ").

Applying the criteria for attorney fees found in Rule 1.5 to Slutsky's assertions, the Clay court noted that while he had presented extrinsic submissions bearing upon several of these factors, many others had no factual support and, accordingly, the balance of factors did not exhibit an abuse of discretion on the part of the trial court in refusing to award him a one-third fee. See Clay, 325 Ill. App. 3d at 902-03. Slutsky did not provide any evidence regarding his

9

skill and reputation, the usual and customary charge for the same services, or other similar instances where fees were increased to one-third. See Clay, 325 Ill. App. 3d at 902-03. Moreover, while he presented six affidavits attesting to the novelty, difficulty and time he spent on the cause, the Clay court found them to be "largely conclusory and without itemization or detail." Clay, 325 Ill. App. 3d at 902. Neither Slutsky nor the affiants ever described or specified how Slutsky spent all the time he claimed he worked on the cause, how many doctors he contacted, how much time he expended with experts or how he arrived at his theories. See Clay, 325 Ill. App. 3d at 903. Moreover, although Slutsky obtained a favorable settlement, his skills were never tested at a trial. See Clay, 325 Ill. App. 3d at 903. Ultimately, the Clay court acknowledged Slutsky for his efforts and the settlement he helped obtain but, while stating that it perhaps may not have reversed a one-third fee had the trial court awarded one, it concluded that it would not increase the fee since there was nothing in the record to indicate that the trial court had abused its discretion in reaching its award. See Clay, 325 Ill. App. 3d at 903-04; see, *e.g.*, Ruiz, 366 Ill. App. 3d at 956 (finding no abuse of discretion on part of trial court where reviewing court likewise "[could not] find that" services rendered "were so extraordinary that an enhanced fee [was] proper").

Interestingly, in the instant case, while Clay is certainly applicable, it is not wholly on point with the facts presented here. In Clay, the trial court had affirmatively held that Slutsky performed extraordinary services in the underlying case; while the amount of additional fees to be awarded was at issue, this portion of the decision was never challenged in, or questioned by, the reviewing court. See Clay, 325 Ill. App. 3d at 896. In contrast, the instant case raises this

very issue, as the trial court here held that Monico did not perform extraordinary services in Madalinski's case. Thus, the firm asserts alternative contentions for its claim that the trial court misinterpreted section 2-1114 in evaluating its petition for fees: either that the court did not exercise its discretion by completely ignoring the factors to be used to determine extraordinary fees as outlined in Clay, or that the court exercised its discretion but abused it in evaluating the factors and ultimately denying additional fees under subsection (c).

In addressing the first contention, we note that Monico, citing South Suburban Safeway Lines, Inc. v. Regional Transportation Authority, 166 Ill. App. 3d 361, 365 (1988), insists on a *de novo* standard of review, as it claims that the trial court failed to use any discretion in considering the fee petition. Specifically, the firm argues that the trial court "fundamentally misconstrued the statute" by declaring that the fee in Madalinski's case was dictated by subsection (a) of section 2-1114 rather than subsection (c).[1] Having reviewed the entire record on appeal, particularly the trial court's colloquy at the hearing on Monico's motion to reconsider, we do not believe that the firm's statement can be fairly attributed to the court.

_____

[1] We note that Monico also contends that the trial court "fundamentally misconstrued the statute" by concluding, "in effect," that subsection (c) applies only to cases tried to verdict rather than to all medical malpractice cases. This is quickly dispelled by the record. During the motion to reconsider, Monico argued this point to the court by stating that section 2-1114(c) applies to all medical malpractice cases, not just those that go to trial. The court immediately responded, "That is correct." Accordingly, we do not find Monico's current appellate subargument of "fundamental misconstruction" in this respect to be viable.

While it is true that the trial court awarded fees only under section 2-1114(a), it is evident that it did so only after it looked at several factors. The court acknowledged that section 2-1114(c) does allow for extraordinary fees above and beyond those prescribed in subsection (a); it simply concluded that Monico had not done enough in Madalinski's case to merit such an award. The record makes clear that the court did indeed, contrary to Monico's assertion, consider the present circumstances. For example, the court's colloquy during the motion to reconsider is replete with statements that it "read everything" and "looked at everything [the firm] gave" it in support of its petition for enhanced fees. This included, by the court's own reference, the affidavits, the ABA article, and documents from Pavich's work commitments in Europe. The court also declared in its written orders denying Monico's petition for extraordinary fees and motion to reconsider that it considered "all facts and circumstances" surrounding this issue. Further, and even more specific, the court made mention of several Clay factors during the hearing on the motion to reconsider. The court stated that it "took *** into consideration" how far the case progressed, that it went beyond what occurred in Clay, and that it considered "all of the factors" of Clay, *i.e.*, that Monico took Madalinski's case at the very end of the statute of limitations, the firm was able to resolve the case in just two years, Monico won the case, and Madalinski was surely happy with the outcome--all while Pavich was commuting from Europe. The court also recognized that Madalinski had signed a one-third fee agreement. Yet, upon all this, the court concluded that "nothing that is in Clay ha[d] been submitted here, except for the fact that *** [the firm] did a nice job on the case," and held, instead, that Monico's "submissions f[e]ll far short" of exhibiting extraordinary services.

From all this, we cannot conclude, as Monico would have us, that the trial court completely ignored the evaluating factors announced in Clay. Simply put, the record clearly contradicts this. Accordingly, the firm's assertion that the court wholly failed to exercise its discretion in considering its petition for extraordinary fees is incorrect.

However, this is not the end of our discussion. Although we find that the trial court did use its discretion in evaluating Monico's fee petition and motion to reconsider, we must still address the firm's alternative contention; that is, we must examine whether, as Monico asserts, the court abused that discretion in considering the Clay factors as they relate to the instant case and in ultimately denying its petition for enhanced fees based on its conclusion that Monico did not render extraordinary services. It is on this point that we agree with the firm and find that Monico provided extraordinary services in litigating Madalinski's case, meriting reconsideration of its fee petition under section 2-1114(c).

As noted, abuse of discretion is the proper standard to be applied when an appellate court is called upon to review a judicial award of attorney fees. See Clay, 325 Ill. App. 3d at 899 (discussing legal reasoning and past case law to arrive at this conclusion as a matter of first impression, noting that this determination is a qualitative rather than quantitative one in which trial court is to apply own knowledge and experience); Ruiz, 366 Ill. App. 3d at 955 (denial of a petition for enhanced attorney fees is reviewed under an abuse of discretion standard). A trial court abuses its discretion when it makes an arbitrary decision or fails to use "conscientious judgment" in reaching its ultimate determination. See In re Marriage of Munger, 339 Ill. App. 3d 1104, 1107 (2003); accord In re Marriage of McDonald, 113 Ill. App. 3d 116, 119 (1983).

Monico presented the trial court with various submissions addressing each of the Clay factors used to evaluate fee petitions. Regarding the first factor of time, labor and difficulty, Monico asserts it expended some 2,000 hours working on Madalinski's case. While the firm has not detailed how it spent these hours via "official" time sheets, it has included in the record a copy of its "costs advanced" sheets which, though primarily highlighting the costs associated with the case, also chart what the firm did (*i.e.*, depositions, filings, record reviews) on what particular days. Most significantly, these sheets provide the names of the various witnesses and medical experts Monico contacted, worked with and deposed. While perhaps not the best evidence to demonstrate the time and labor allocated in a case, the sheets do verify Monico's assertions that it deposed some 45 witnesses, conducted lengthy expert (four liability and one damages expert, two of which resided out of state) and written (hospital manual and protocol review, requiring further depositions) discovery, participated in two all-day mediations, and prepared for trial. Moreover, as further evidence of its labor and the intricacy of the underlying case, Monico called 20 witnesses at trial and presented medical expert testimony via 6 evidence depositions, one of which required an out-of-state visit. The trial lasted some 2 ½ weeks.

As soon as Monico accepted Madalinski's case, the firm dealt with the next Clay factor of the likelihood of acceptance precluding other employment. Monico informed Madalinski even before taking his case that Pavich, the lead attorney who would be working on it, had just been assigned by the United Nations War Crimes Tribunal to work in Europe for three to six years. Monico further explained that the firm was in the process of opening an international office and transferring some of its staff to Europe as well. Though it would accept the case, Monico made

certain that its new client understood it was reducing its number of cases overall because of this and that the instant case would require a lot of effort because it would be vigorously defended by the opposing party.

In addressing the next factor of the fee customarily charged for such a case, Monico presented the trial court with documents from two prior cases in which the firm was involved. Both of these, like Madalinski's, were wrongful death medical malpractice cases involving surviving spouses and children. In both these instances, Monico was awarded a one-third fee for its work.

Regarding the amount involved and the results obtained in this case, we note that following two all-day mediations, the hospital made no offer to Madalinski. Yet, at the close of trial, Monico was able to secure a high-low agreement of between $2 million and $5,750,000. And most interestingly, the jury, returned a verdict of $12,407,572. Monico, thus, was able to secure the high end of the agreement for Madalinski and his children, a sizeable settlement especially in light of the fact that two other firms had reviewed and then declined to take his case. Also significant is that the firm was able to negotiate a settlement; this meant no posttrial motions or appeals jeopardizing or delaying Madalinski's award. Clearly, Monico obtained optimal results with the work it performed, with even the trial court here acknowledging that Madalinski was undoubtedly satisfied.

These results are even more impressive when the time limitations surrounding this case are considered. Madalinski did not present the case to Monico until there were only a few weeks left before the expiration of the statute of limitations on the claim. In addition, as noted earlier,

Madalinski approached Monico at a time when the firm was expanding to Europe, it was decreasing the number of cases accepted, and one of its primary attorneys, the one who would be assigned to the case, was required to work overseas on international matters for three to six years. In spite of this, Monico was able to conduct an expedited review of Madalinski's case and find, in a very short amount of time, substantive legal evidence through its consultations with experts to form the bases of viable claims--something two previous law firms could not.  Not only was Monico able to timely file the suit, but it was able to do so on behalf of both Madalinski and his minor children and include claims other than wrongful death, such as counts involving the Survival Act and Family Expense Act.

Regarding the remaining Clay factors, Monico demonstrated to the trial court that it had built a relationship with Madalinski that has lasted approximately four years and while the majority of it encompassed preparing him and his children for this trial, the firm also helped the family in other legal matters.  Moreover, the affidavits Monico provided in this case from long-time medical malpractice attorneys Fetzer and Gifford provided worthy insight into the firm's experience, reputation and abilities.  This is because Fetzer and Gifford observed firsthand Monico's conduct and preparation at the two all-day mediations.  Fetzer and Gifford, having become quite familiar with the case, both attested that the firm invested an extraordinary amount of time and effort during discovery and pretrial stages, that this was a difficult case with a significant risk of a defense verdict, and that Monico "demonstrated an exceptional degree of skill, tenacity and perseverance throughout" the litigation.  Additionally, it cannot be denied that Pavich has a formidable legal reputation, exemplified by his selection by the United Nations War

16

Crimes Tribunal to be its lead and consulting counsel in several major international matters. Pavich, in fact, has litigated medical malpractice claims for over 20 years and has been a mediator, and his litigation team at Monico is stocked with experienced personnel, including a nurse/attorney whose experience and knowledge proved vital to Madalinski's case. Finally, as the trial court recognized, Madalinski agreed at the outset of this case to a one-third contingent fee agreement. He has not at any point in this matter, even at the current appellate level, attempted to declare that such a fee for the work Monico did in his case is unreasonable.

Upon review of all these factors, one may argue that the submissions in the instant case are similar to those of attorney Slutsky in Clay and, thus, that the same result should be reached; that is, that Monico does not merit additional fees under section 2-1114(c). However, as we highlighted earlier, the instant case is distinguishable from Clay. Again, the trial court in Clay held that Slutsky had performed extraordinary services in the underlying medical malpractice case. See Clay, 325 Ill. App. 3d at 897. Although the trial court did not give Slutsky a full one-third fee, it did award him in excess of what he would have received under section 2-1114(a) (about 26.68% rather than 20% of the recovery) by instead evaluating his fee petition under subsection (c), precisely because of his extraordinary services. See Clay, 325 Ill. App. 3d at 904. That Slutsky was found to have performed extraordinary services and merited a fee review pursuant to subsection (c) rather than (a) was never in dispute; the Clay court acknowledged the trial court's holding that Slutsky had performed accordingly and focused only on whether the enhanced fee it had awarded Slutsky under subsection (c) should have been greater (*i.e.*, an amount closer to one-third or perhaps even more, as he desired) because of his extraordinary

17

No. 1-04-3350

services. See Clay, 325 Ill. App. 3d at 897, 901-04.

The significant difference in the instant case is that the trial court here, after employing the criteria the Clay court used to determine the propriety of Slutsky's award, held that Monico did not perform extraordinary services in Madalinski's medical malpractice case. Yet, based on our review of the factors, it is clear to us that the firm did indeed perform these services, particularly when Monico's submissions for its additional fee petition are compared to Slutsky's. The Clay court declared it had no basis to alter the trial court's award for multiple reasons. For example, it criticized Slutsky for his failure to provide factual support for several factors, such as his skill and standing in the community and the customary charge for similar services. See Clay, 325 Ill. App. 3d at 903. Nor did Slutsky ever provide documentary evidence of other similar instances where fees were increased to one-third of a recovery, or any detail as to how he spent the hours he said he worked on the case, or at the very least how many doctors or experts he contacted. See Clay, 325 Ill. App. 3d at 903. Moreover, the Clay court found the affidavits Slutsky submitted to be conclusory and nonspecific. See Clay, 325 Ill. App. 3d at 903. And, significantly, though Slutsky reached a favorable settlement for his client, he was never required to take the case to trial. See Clay, 325 Ill. App. 3d at 903 (Slutsky's skill and the difficulties of the case were "never fully tested in a trial arena").

Monico's situation, however, is in direct contradiction to Slutsky's. Unlike that attorney, Monico demonstrated the firm's skill and standing in the community by submitting documents showing that its lead attorney had been hand-selected by a committee of the United Nations to lead and consult on international projects in Europe. Monico's employees are also well versed in

18

medical situations, having a registered nurse/attorney on staff whose experience and knowledge proved vital to Madalinski's case. Moreover, unlike Slutsky, the firm provided the trial court with two other medical malpractice cases similar to Madalinski's on which it worked (*i.e.*, also involving surviving spouses and children), wherein its fees were increased to one-third of the recovery. While Monico, like Slutsky, failed to attach an "official" time sheet outlining the hours of its work in this case, the record does contain a list of its costs advanced which clearly details, unlike Slutsky's submissions, all the doctors and experts the firm contacted as well as all the activities it performed on Madalinski's behalf to prepare his case. Significantly, though the ultimate conclusion of this case was a settlement, Monico's skill and mastery of the difficulties of this case, unlike Slutsky's, were tested at a trial that lasted almost three weeks and would have obtained a huge jury award for Madalinski.

In addition to this, it cannot be forgotten that Monico took Madalinski's case with only a few weeks left before the expiration of the statute of limitations, and two previous firms had refused to take the case because they could not substantiate any viable claims. Monico was able to conduct an expeditious review, complete with experts, and timely file the case to include the minor children and multiple counts of liability. The firm then took the case all the way to trial, all while its lead attorney juggled obligations overseas. While the affidavits Monico attached to its fee petition can be labeled conclusory in some respects like those in Slutsky's case, these affiants, as mediators, were more than familiar with this case. Gifford and Fetzer saw firsthand Monico's preparation and work from pretrial to settlement; they were not simply detached attorneys commenting on general medical malpractice cases but, rather, active participants who

19

attested to the difficulty of Madalinski's case in particular, the "significant risk" of a defense verdict, its vigorous contest, and the "exceptional degree of skill, tenacity and perseverance" of Monico throughout the entire litigation.

It is our view that if, based on the facts of Clay, that trial court found that Slutsky warranted an enhanced fee for extraordinary services and awarded him accordingly under section 2-1114(c) with the reviewing court's acknowledgment and affirmance, then Monico, which submitted even more support for its assertion that it performed extraordinary services, certainly deserves the same. It is the differences between the instant case and Clay, which we have highlighted, that support our reasoned conclusion that Monico merits a reconsideration of the trial court's determination that the firm did not perform extraordinary services in Madalinski's case.

Therefore, having found that Monico performed extraordinary services on behalf of Madalinski in the underlying medical malpractice case, we believe the best course of action is to remand this case to the trial court to reevaluate the firm's additional fee request pursuant to subsection (c) of section 2-1114 dealing with extraordinary services, rather than subsection (a), which does not consider them. See Clay, 325 Ill. App. 3d at 899 (having the trial court, which observed counsel during litigation, evaluate a fee claim is "the more appropriate" method of review).

## CONCLUSION

Accordingly, for all the foregoing reasons, we reverse the judgment of the trial court and remand this cause for further proceedings pursuant to our decision.

No. 1-04-3350

Reversed and remanded.

McNULTY, J., concurs.

O'MALLEY, J., dissents.

Justice O'MALLEY dissenting:

I respectfully dissent from the majority opinion. I would not send the case back for reconsideration but would affirm the trial court's finding that no exceptional circumstances exist which would justify additional fees. However, I would reverse the lower court and hold that a one-third contingency fee should be awarded based upon the fact that the client signed a valid contract agreeing to the same.

First, in my view, there is no reason to send this case back pursuant to any subsection of section 2-1114 (735 ILCS 5/2-1114 (West 2006)), or for any other reason. The record shows that the trial court carefully considered everything plaintiffs proffered to show that their representation was exceptional; further, she repeatedly said that she had considered "everything." The judge found that while these attorneys had done a good job which resulted in a favorable outcome for plaintiff, there was insufficient evidence of extraordinary work which would justify a fee larger then what the statute prescribes.

The majority acknowledges, and I agree, that the standard which applies here is an abuse of discretion. Thus, if we were to reverse the trial court's decision as to exceptional circumstances or the lack thereof, we would have to find that no reasonable court could have reached the same conclusion. Clay v. County of Cook, 525 Ill. App. 3d 898 ("an abuse of discretion occurs when no reasonable person would agree with the position taken by the trial

21

court"). While as a reviewing court, we may have reached a different conclusion, it is axiomatic that we should not substitute our judgment for that of the lower court, because it is almost always in a better position to assess the circumstances. See In re Marriage of Samardzija, 365 Ill. App. 3d 702, 708 (2006) ("Under the abuse of discretion standard, the question is not whether the Appellate Court might have decided the issue differently, but whether any reasonable person could have taken the position adopted by the trial court").

In reviewing the evidence presented regarding the number of depositions, motions *in limine*, a single mediation and other work performed, this very experienced trial judge reached the conclusion that there was nothing out of the ordinary. Viewing the same evidence, I cannot say that no reasonable person could have reached this conclusion. Medical negligence cases routinely, or as a matter of course, require an enormous commitment in terms of time and money for lawyers who handle them. The lawyers presumably know this at the outset. In this case, the number of depositions, 45, and motions *in limine, 29,* and the length of the trial, 2 ½ weeks, among other things, does not appear to be extraordinary for this type of litigation. In fact, the numbers in other cases, are often well in excess of those documented in this case.

The only unusual thing here is that a partner who had European commitments was assigned to this case and apparently did much commuting. This seems to be the firm's choice and, in my view, does not represent any "extraordinary effort." I would thus affirm the lower court's ruling that no exceptional circumstances existed which would justify a larger than normal fee. In addition, because I believe the court examined all the factors initially, I would decline to send it back for another review.

However, the client in this case signed a contract agreeing to pay the firm "one-third of the gross sum recovered." No one, including the client, has challenged that. The Supreme Court has held that contingent fee agreements are appropriate so long as they are reasonable. Arnold v. Northern Trust Co., 116 Ill. 2d 157 (1987). One might speculate that the client was under some pressure to agree to a larger fee where his case had been declined by several other law firms and the statute of limitations was running imminently. An equally reasonable speculation is that the client was absolutely delighted to have found someone to champion his cause. However, this is pure speculation and there is no allegation or even suggestion here that this contract was not absolutely voluntary nor that it was not reasonable. Therefore, I would reverse and award the additional fees requested by the law firm on the basis of this valid contract.